WILLIAMS, J.
|, The defendant, Jerry Matthew Sander-son, was charged by bill of information with two counts of aggravated incest, in violation of LSA-R.S. 14:78.1, three counts of sexual battery, in violation of LSA-R.S. 14:48.1, and molestation of a juvenile, in violation of LSA-R.S. 14:81.2.[1] Following a jury trial, he was found guilty as charged of one count of aggravated incest, one count of attempted aggravated incest, two counts of sexual battery [2] and molestation of a juvenile.
The defendant was sentenced to serve 25 years at hard labor for the aggravated incest conviction, and 20 years at hard labor for the attempted aggravated incest conviction. The sentences Were ordered to be served concurrently and.without the benefit of parole, probation or suspension of sentence. He was also sentenced to serve 25 years at hard labor without the benefit of parole, probation or suspension of sentence for each of the two convictions for sexual battery. With regard to the molestation of a juvenile conviction, the defendant was sentenced to serve “a minimum of 25 years without benefits.” The sentences for the sexual battery and molestation of a juvenile convictions were ordered to be served concurrently to each other, but consecutively to the sentences for the aggravated incest and attempted aggravated incest convictions.
For the following reasons, we affirm the defendant’s convictions. We |2also affirm the sentences imposed for the aggravated incest and attempted aggravated incest convictions. We vacate the sentences imposed for the sexual battery and molestation of a juvenile convictions and remand this matter to the trial court for resentenc-ing. Further, on remand, the trial court shall provide the appropriate written notice to the defendant of the sex offender registration requirements.
FACTS AND PROCEDURAL HISTORY
The defendant is the step-great grandfather of C.W.,[3] one of the victims in this case.[4] During the trial, C.W.’s mother testified as follows: her three daughters, R.W., C.W. and H.W., her husband and she lived in Michigan; during the summers (and some holidays), her daughters visited their father, J.W., and his wife, who lived on the defendant’s property in Oua-chita Parish; J.W.’s wife is the defendant’s granddaughter; on December 29, 2010, the children returned to Michigan after visiting with their father; upon, her return C.W. confided to her mother that the defendant “touches her”; when asked to explain, C.W. pointed to her vagina and stated that the defendant “sticks his fingers *154 down there”; C.W. also told her mother that the defendant had warned her not to tell anyone because she would “get in trouble” if she did so; C.W. stated to her mother that she told her older sister, H.W., what the defendant had done, but H.W. did not believe her; |aC.W.’s mother immediately called the Oakland County Sheriffs Office in Pontiac, Michigan; thereafter, C.W. and her younger sister, R.W., were physically examined for signs of sexual abuse; the examinations did not provide any physical proof to support the allegations; later, C.W. began to exhibit “behavioral issues” in school; in January 2011, after disclosing the sexual abuse, C.W. began counseling; C.W. was examined by a doctor, who diagnosed her with post-traumatic stress disorder; C.W. began urinating on herself and expressing trepidation about being around older men; on January 21, 2011, upon the request of Deputy Kurt Matich, of the Oakland County Sheriffs Office, the three girls were interviewed at the Care House, a children’s advocacy center in Michigan;[5] C.W. and R.W. were interviewed separately; both girls told the interviewer that they had been touched inappropriately by the defendant.[6] On cross-examination, the children’s mother conceded that H.W. had made a statement to police that she believed C.W. was lying because she was with C.W. the entire time they were in Louisiana and she did not see the defendant touch her.
At trial, Jennifer Dubs, a forensic interviewer, testified that she interviewed C.W., H.W. and R.W. on January 21, 2011, at the Care House in Michigan. The video of C.W.’s interview was played in open court, ^During the interview, C.W. told Dubs that during the summer she visited her father, who lived next door to the defendant. C.W. stated that on one day during her visit, she went swimming with H.W., her stepbrother and some other children. While she was standing on a raised area of the deck near the swimming pool, the defendant unzipped his pants and she could see the part of his body “where boys go pee.” C.W. also stated that the defendant then used his finger to touch inside her “private area where it’s against the law.” C.W. stated that no one saw the defendant touch her. She also stated that he had touched her on “two or four” other occasions. The video recording revealed that C.W. was noticeably upset when describing the defendant’s conduct and she was reluctant to give details of the incidents. C.W. kept repeating that she just wanted to forget what happened to her.
On June 9, 2011, at Sgt. Caston’s request, C.W. was interviewed at the Children’s Advocacy Center in Monroe, Louisiana. The interview was conducted by Jennifer Graves, an expert forensic interviewer. During the interview, C.W. made the following statements to Graves: when she was six or seven years old, she stayed with her father for the summer; the defendant touched her “private area” after she got out of the pool; the defendant was sitting on a raised bench by the pool and *155 C.W. was sitting on his lap; the defendant opened his pants and tried to get her to touch his penis, but she refused; the defendant would touch her “privates”[7] when she was wearing a bathing suit; the following day, she sat on the defendant’s lap | ¿wearing a bathing suit while he was driving a tractor; she told the defendant that she did not want him to touch her anymore; the defendant warned her never to tell anyone about the incidents. C.W. was unsure of how many times the defendant touched her and she stated that she had not seen the defendant since Christmas of 2010.
C.W. also testified during the defendant’s trial.[8] By this time, she was 10 years old. She testified that she told the truth during her interviews in Michigan and Louisiana. C.W. also identified a letter she wrote to her teacher dated September 24, 2011, wherein she stated that the defendant “opened his zipper and told me to touch it.” Additionally, C.W. identified photographs of the swimming pool area at the defendant’s house, which depicted a raised portion of a deck with a bench next to the pool.
Deputy Tammy Philley, a former investigator of the Ouachita Parish Sheriffs Office, testified that in 2003, she investigated two prior complaints of sexual battery made against the defendant. More specifically, Deputy Philley stated that a woman had called the sheriffs office, complaining that her daughter, S.T., and niece, S.C., who were both 10 years old, had been with the defendant at his pool when the incidents occurred. According to Deputy Philley, at the time of the complaint, the sheriffs office was unable to locate the defendant to further investigate the allegations.
Sgt. Caston testified as follows: she reviewed C.W.’s videotaped interview from the Care House and the letter C.W. had written to her teacher; she also observed C.W.’s interview at the Children’s Advocacy 1 ^Center in Monroe; during the course of her investigation of the 2010 allegations, she discovered the 2003 complaint filed against the defendant; the complaint listed the defendant as a suspect in the sexual battery of S.T. and S.C.; following the defendant’s arrest, she was contacted by another victim, D.H., who informed her that she had been sexually abused by the defendant when she lived next door to him; D.H. also stated that the sexual abuse was ongoing, beginning in 1997, when she was seven years old, and ending when she was 9 1/2; the abuse ended when D.H.’s family moved away. D.H. said she had been molested by the defendant in his barn.
On February 18, 2011, Sgt. Caston and Sgt. Duane Harold interviewed the defendant after he waived his Miranda[9] rights. At trial, an audio recording of the defendant’s statement was played for the jury.[10] During the interview, the defendant repeatedly denied touching C.W. inappropriately. He also denied the sexual battery allegations made by S.T., S.C. and D.H. The defendant stated that it was possible *156 he “accidentally” touched C.W. on her “private area” while they were swimming and/or while he was playing with her. However, he maintained that he never intentionally touched her inappropriately. The defendant also stated that when the children played in the swimming pool, he would monitor them from a bench that was raised higher than the pool. He stated that sometimes C.W. and her sisters would sit with him on the bench. Further, the Jjdefendant admitted that he had taken C.W. for rides on his tractor during the Christmas holidays. He also admitted that the last time C.W. visited, she rode with him on the tractor seated in front of him. At that time, she told him that she did not want him to touch her “down there” anymore. The defendant claimed that he may have “accidentally” touched C.W. while he was turning the tractor’s steering wheel. The defendant also refuted C.W.’s allegation that he showed her his penis. However, he told the investigating officers that he sometimes wore a bathing suit that was “ripped” on one side.
D.H., whose date of birth is August 17, 1990, also testified at the trial. She stated that when she was seven years old, she lived two houses away from the defendant and his wife, Flo Sanderson. She stated that Flo would babysit her two sisters and her after school, on weekends and during the summer. Additionally, her sisters and she would sometimes stay overnight at Flo’s home; the defendant was present most of the time. D.H. also testified that the defendant would sit on some steps next to the pool and watch her sisters and her swim; the defendant would sit near the swimming pool, remove his penis from his pants and make her touch him. D.H. identified the same photographs of the swimming pool area that were shown to C.W. and stated that the pool looked substantially the same as it did when she would visit the defendant’s house.
During her testimony, D.H. also recalled incidents that occurred in the defendant’s barn, when she would accompany him to feed and ride his horses. She testified as follows: the defendant grabbed her hand and placed |sit inside his overalls where she could feel his penis; he asked her if he could play with her “donkey,” a term he used to refer to her vagina; the defendant then used his hand to touch her vagina; whenever she was in the barn with the defendant, he would open the front of her jumper or skort[11] and touch her vagina; sometimes, the defendant would put his finger inside her vagina; the defendant kept a coffee can in which he kept money; he would tell her that she could have the money if she was a “good little giri” and did not tell her parents about his behavior; the defendant would give her money before he touched her; the incidents around the swimming pool and in the barn continued until 2000, when D.H.’s family moved away for a few years. D.H. also testified that she called Sgt. Caston in February 2011, after her stepmother told her that the detective had called asking for her. She further stated that she informed Sgt. Caston that she suspected that S.T. and S.C., who also lived near the defendant, may have been victims of the defendant’s sexual misconduct.
On cross-examination, D.H. testified that in 2013, after she moved back to the home near the defendant, she sent Flo and the defendant’s granddaughter, Lonna Yrue-gas, a “thank you” card because they had sent her a wedding shower gift. D.H. was shown a photograph of her son with a man *157 dressed in a Santa Claus costume, but she denied knowing that the man posed in the costume was the defendant.[12]
|9S.T.’s mother, A.T., also testified at trial. She testified as follows: during the summer of 2003, her daughter, S.T., and her niece, S.C., would go to the defendant’s house to do yard work and swim;[13] after a conversation with her youngest son, she contacted the Ouachita Parish Sheriffs Office to file a complaint against the defendant for his inappropriate behavior with S.T. and S.C.; police officers came to her house to conduct interviews and investigate the complaint; she never heard anything further regarding the complaint.
On re-direct, the state asked A.T. what her daughter, S.T., had told her about the defendant’s inappropriate touching. The defense objected, arguing that her answer would consist of inadmissible hearsay evidence. A hearing was held outside the presence of the jury. The state contended S.T.’s prior statements to her mother were admissible under LSA-C.E. . art. 801(D)(1)(d). It ’also argued that S.C.’s-prior statement was admissible under LSA-C.E. art. 804(A)(5) because S.C. was not an available witness and the statement involved an initial complaint of sexually assaultive behavior. According - to the prosecutor, Tom Jones, an investigator for the Fourth Judicial District Attorney’s Office, attempted to serve S.C. with a subpoena at her mother’s house, but S.C.’s mother would not provide him - with an address. The prosecutor also informed the trial court that she had asked S.C.’s mother for S.C.’s address, but she was told it was unknown. |10A.T. was also questioned regarding the availability of her niece, S.C. She testified that S.C. was presently living in Texas, but that she did not know her exact whereabouts. A.T. stated that her daughter had spoken to S.C.’s mother, who claimed that she could not get in touch with her daughter. A.T. stated that she had -seen S.C. during Christmas, less than a month prior to .the trial; however, she had not spoken with her. A.T. also stated that her nephew, Ryan, was approximately 11 years old in 2003.[14]
District Attorney investigator Jones testified that he attempted to locate S.C. to serve her with a subpoena. S.C.’s family had informed him that she was living in Arkansas, but they did not have a specific address for her. Jones found an address where S.C. had been living in Arkansas, but he soon learned that she and her boyfriend had moved- away. Jones was then told by someone that S.C. may have moved to Texas, but no one in S.C.’s family was able to provide him with a Texas address. Jones stated that he spoke with two different women, trying to obtain S.C.’s address, but he did not remember their names. On cross-examination, Jones admitted that he was unsure whether he spoke to S.C.’s mother with regard to her daughter’s whereabouts.
Following Jones’ testimony, the trial court found that the state had utilized reasonable means to try to contact S.C. Therefore, the trial court considered her to *158 be unavailable pursuant to LSA-C.E. art. 804(A)(5). The trial court noted that the prosecutor had stated that she personally instructed | nS.C.’s mother to contact her if she found an address for S.C. Further, the trial court determined that S.T.’s prior statement was admissible because, although S.T. made the initial complaint to an 11-year-old boy, the allegations were immediately relayed to A.T. The trial court explained that LSA-C.E. art. 801(D)(1)(d) more than likely referred to a first complaint to an adult about sexually assaultive behavior, rather than to another child.
A.T. continued her testimony, stating that she was the first adult that S.T. and S.C. told about the sexual abuse. A.T. stated S.C. told her that, on more than one occasion, the defendant put his hands under her bathing suit while they were swimming. Similarly, S.T. told A.T. that the defendant had touched her “under the bathing suit” once when she had gone swimming at the defendant’s pool.
S.T. also testified at trial. She stated that in 2003, when she was 10 years old, she and S.C. went to the defendant’s house to do chores in exchange for money. The girls were allowed to swim in the defendant’s pool and the defendant told them that he would teach them how to dive. However, when the defendant was close to her in the pool, he put his hand under her bathing suit and placed his finger inside her vagina. S.T. testified that he did so more than once. S.T. also testified that she saw the defendant place his hand under S.C.’s bathing suit. Further, S.T. stated that her cousin, Ryan, told her brother about the sexual misconduct. Her brother, in turn, told her mother. S.T. also testified that she did not have a current telephone number or address for S.C.; however, S.C.’s mother kept in contact with S.C.
1iaLonna Yreugas, the defendant’s granddaughter, was the sole defense witness. She testified that she lived with her grandparents from the day she was born until 2004. Yruegas recalled that D.H. and her sisters would visit the defendant’s house; however, she stated that she did not remember D.H. ever spending the night or the weekend at them house. Yruegas also testified that she was always home when D.H. and her sisters visited their home. She stated that the defendant had never babysat D.H. and he never had any “real” contact with her. Additionally, Yruegas testified that none of the children were allowed to enter the barn because it was a dangerous area. Yruegas identified a photograph of D.H., her son and the defendant dressed in a Santa Claus costume.[15] Further, Yruegas stated that neither S.T., S.C. nor Ryan had ever been invited to the defendant’s house. She claimed that the children had “trespassed” on the defendant’s property in 2003, by entering one of the pastures to look at a bull.
D.H. was called as a rebuttal witness. She testified that during the summer months, her sisters and she would spend the night at the defendant’s home. She also stated she accompanied the defendant into the barn almost every day to saddle horses. She further stated that she had seen both of his granddaughters in the barn.
As stated above, on January 17, 2014, the jury found the defendant guilty of the following offenses: aggravated incest of C.W., a person under the age of 13; attempted aggravated incest of C.W., a person under the age of 13; sexual battery of S.T., a person under the age of 13; sexual *159 battery of 113D.IL, a person under the age of 13; and molestation of D.H., a person under the age of 13. The jury found the defendant not guilty of the sexual battery of S.C.
On May 8, 2014, the trial court sentenced the defendant to 25 years at hard labor without the benefit of parole, probation or suspension of sentence for the aggravated incest conviction, 20 years at hard labor without the benefit of parole, probation or suspension of sentence for the attempted aggravated incest conviction, 25 years at hard labor without the benefit of parole, probation or suspension of sentence for the conviction for the sexual battery of S.T., 25 years at hard labor without the benefit of parole, probation or suspension of sentence for the conviction for the sexual battery of D.H., and 25 years at hard labor without the benefit of parole, probation or suspension of sentence for his molestation of a juvenile conviction. The sentences imposed for his aggravated incest and attempted aggravated incest convictions were ordered to run concurrently to each other, but consecutively to the sentences imposed for his sexual battery and molestation of a juvenile convictions. Further, the sentences imposed for his sexual battery and molestation of a juvenile convictions were ordered to run concurrently to each other.
The defendant filed a motion to reconsider his sentences. Thereafter, on June 9, 2014, the state filed a “State’s Motion to Amend Incorrect Sentence” wherein the state requested the trial court amend the defendant’s sentences to require him to pay for C.W.’s counseling expenses, as provided by LSA-R.S. 14:78.1. The state also filed an opposition to the defendant’s 114rnotion to reconsider his sentences. Following a hearing, the trial court denied the defendant’s motion to reconsider sentences and granted the state’s motion to amend the sentences. The court ordered the defendant to pay $1,700 to C.W.’s family for counseling expenses.
The defendant now appeals.
DISCUSSION

Sufficiency of the Evidence

The defendant contends the state’s evidence was insufficient to support his convictions. Specifically, he argues that C.W.’s statements to the forensic interviewers were inconsistent and were a product of coercion by the interviewers. He also argues that he could not have touched C.W. near the pool as she described because “someone” would have noticed. The defendant asserts that C.W. never testified that anything had occurred between the dates of December 21 through December 29, 2010, as alleged in the bill of information; therefore, there was no evidence to support his conviction for attempted aggravated incest.
Further, the defendant takes issue with D.H.’s testimony, citing the testimony of his granddaughter, Lonna Yruegas. According to the defendant, Yruegas’ testimony contradicted D.H.’s testimony in several respects. The defendant also points out that he later posed for a photograph with D.H.’s son and D.H. had sent his wife and granddaughter a “thank you” note after the date the alleged sexual abuse was supposed to have occurred. Apparently, the defendant argues that D.H. would neither have allowed her son to pose with him nor sent them a “thank you” note if he had _j_iSsexually abused her.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. *160 Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 861 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). This standard, now legislatively embodied in LSA-C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833. On appeal, a reviewing court must view the evidence in the light most favorable to the state and must presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. Jackson, supra.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 2009-0725 (La.12/11/09), 23 So.3d 913, cert. denied, 561 U.S. 1013, 130 S.Ct. 3472, 177 L.Ed.2d 1068 (2010); State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529.
11fiWhere there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Gullette, 43,032 (La.App.2d Cir.2/13/08), 975 So.2d 753; State v. Burd, 40,480 (La.App.2d Cir.1/27/06), 921 So.2d 219, writ denied, 2006-1083 (La.11/9/06), 941 So.2d 35.
The testimony of the victim alone in a sexual assault case is sufficient to convince a reasonable fact-finder beyond a reasonable doubt of a defendant’s guilt. State v. Rives, 407 So.2d 1195 (La.1981); State v. Wade, 39,797 (La.App.2d Cir.8/9/05), 908 So.2d 1220; State v. Elzie, 37,920 (La.App.2d Cir.1/28/04), 865 So.2d 248, writ denied, 2004-2289 (La.2/4/05), 893 So.2d 83. Furthermore, such testimony alone is sufficient, even where the state does not introduce medical, scientific or physical evidence to prove the commission of the offense by the defendant. State v. Wade, supra.
[ 17Aggravated Incest and Attempted Aggravated Incest
In 2010, LSA-R.S. 14:78.1 defined the crime of aggravated incest[16] as follows:
A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild of any degree, brother, sis *161 ter, half-brother, half-sister, uncle, aunt, nephew or niece.
B. The following are prohibited acts under this Section:
(1) Sexual intercourse, .sexual battery, second degree sexual battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.
An attempt to commit a crime requires specific intent to commit the crime and an overt act tending directly toward the accomplishment of that crime. See LSA-R.S. 14:27.
In C.W.’s taped interviews, she stated that during the summer of 2010, the defendant touched her “private area” after she exited the pool and as she stood next to him on the deck. C.W. described the incident in detail |isand explained that although her father and stepmother were in the pool, they did not see the act because they were supervising younger children. C.W. also stated that the defendant unzipped his pants, showed her his penis and told her to touch it. C.W. testified at trial that her statements were truthful. Apparently, the jury believed C.W.’s testimony.
Although C.W. did not specifically describe any abuse that occurred during Christmas of 2010, the defendant admitted that he would take C.W. alone on tractor rides. He also admitted that during C.W.’s last visit, which was during the Christmas holidays of 2010, he thought he may have accidentally touched C.W. when steering the tractor. He also stated that C.W. told him that she did not want him to touch her “privates” anymore. Additionally, C.W.’s mother testified that C.W. told her details of the incidents of sexual abuse soon after she returned to Michigan, on December 29, 2010.[17]
After viewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to prove beyond a reasonable doubt that the defendant was guilty of the offenses of aggravated incest and attempted aggravated incest. Pursuant to the 2010 statutory definition of aggravated incest, the evidence established that the defendant was C.W.’s step-great grandfather. The evidence also established that the defendant touched C.W.’s vagina, exposed his penis to her and asked her to |19touch it. The defendant, although denying culpability, admitted that C.W. told him that she did not want him to touch her “privates” anymore. Further, the evidence was sufficient to establish that the defendant did not “accidently” touch C.W. or expose his penis to her. In fact, C.W. specifically stated that the defendant warned her not to tell anyone about his actions, a clear indication that he knew his actions were intentional and clearly were not accidental. Accordingly, the defendant’s argument is without merit.

*162
Sexual Battery

In 1997-2003, the relevant time period herein, LSA-R.S. 14:43.1[18] defined “sexual battery” as follows:
A. Sexual battery is the intentional engaging in any of the following acts with another person, who is not the spouse of the offender, where the offender acts without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender:
(1) The touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender; or
(2) The touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim.
In the instant case, the state’s evidence established that neither S.T. nor D.H. was the spouse of the defendant. The evidence also established | gpthat neither of the victims had “attained fifteen years of age” and that both girls were more than three years younger than the defendant.

S.T.

At trial, S.T. testified that during the summer of 2003, while she and her cousin, S.C., were swimming, the defendant placed his hand underneath her bathing suit and inserted his finger inside her vagina “more than one time.” S.T. also stated that she observed the defendant touching S.C. underneath her bathing suit as well. S.T.’s mother confirmed that her daughter told her that she had been touched inappropriately by the defendant. The jury’s decision to accept S.T.’s testimony as truthful is entitled to great deference. Accordingly, we find that the foregoing testimony was sufficient to support the jury’s verdict.

D.H.

D.H. testified at trial that the defendant and his wife babysat her sisters and her from 1997 to 2000. She unequivocally stated that the defendant sexually abused her during the time she visited his house. D.H. described certain events in specific detail. She stated that while alone with the defendant in his barn, the defendant grabbed her hand, placed it inside his overalls and placed it on his penis. The defendant then asked her if he could play with her “donkey,” and placed his hand inside her pants and touched her vagina. We find that D.H.’s testimony provides sufficient evidence to support the defendant’s conviction for sexual battery.

Molestation of a Juvenile

LSA-R.S. 14:81.2 defines the crime of molestation of a juvenile as J^follows:
A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile’s age shall not be a defense.
*163 Although the statute does not define the terms “lewd” or “lascivious,” the Louisiana Supreme Court has determined that the statute “provides fair notice that the defendant is charged with having done an act upon the person of a juvenile which is lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner.” State v. Interiano, 2003-1760 (La.2/13/04), 868 So.2d 9, 15. Evidence is sufficient to prove “the use of influence by virtue of a position of control or supervision” [19] as an element of molestation of a juvenile where a defendant frequently had the victim in his charge without other adults present. See State v. Goss, 46,193 (La.App.2d Cir.5/18/11), 70 So.3d 6.
As stated above, D.H. testified that she was alone in the barn with the defendant when he committed the offense of conviction. D.H. also testified with regard to a separate occasion when she was alone with the defendant. She stated that when the defendant was near his pool, he removed his penisjagfrom his pants and forced her to touch it. The evidence was undisputed that at the time of the incidents, the defendant was over the age of 17; D.H. was under the age of 17, and the age difference between the two was greater than two years. Additionally, D.H. testified that although the defendant’s wife was her babysitter, she was alone with the defendant at times, with no other adults present. Further, the defendant’s act of placing D.H.’s hand inside his overalls and forcing her to touch his penis constitutes lewd or lascivious behavior, “with the intention of arousing or gratifying the sexual desires of either person, ... by the use of influence by virtue of a position of control or supervision over the juvenile.” Consequently, the elements required to prove molestation of a juvenile under LSA-R.S. 14:81.2 were satisfied. This argument lacks merit.
Evidentiary Ruling — Unavailability of S.C.
The defendant contends the trial court erred in allowing A.T. to testify that S.C. told her the defendant touched her vagina. The defendant concedes that the jury did not convict him of the sexual battery of S.C.; however, he argues that A.T.’s testimony regarding S.C.’s out of court statements prejudiced him with regard to the other charges. He also argues that the state did not make reasonable efforts to locate S.C., and therefore, she should not have been considered an unavailable witness. In particular, the defendant points out that the district attorney’s investigator, Tom Jones; admitted that he never spoke to S.C.’s mother to try to obtain S.C.’s address.
“ “Hearsay” is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove thej^truth of the matter asserted.” LSA-C.E. art. 801(C). Hearsay is not admissible except as provided for by law. LSA-C.E. art. 802. _LSA-C.E. art. 804 provides, in pertinent part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is “unavailable as a witness” when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
[[Image here]]
(5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance *164 by process or other reasonable means[.]
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
[[Image here]]
(5) Complaint of sexually assaultive behavior. A statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint mf sexually assaultive behavior.
[[Image here]]
Determining the unavailability of a witness is a preliminary question for the trial court. LSA-C.E. art. 104(A); Folse v. Folse, 98-1976 (La.6/29/99), 738 So.2d 1040. The judge may consider otherwise inadmissible evidence in determining the preliminary factual question. Folse, supra. A trial court’s determination as to the unavailability of a witness is subject to manifest error review, and will not be overturned absent an abuse of discretion. State v. Ball, 2000-2277 (La.1/25/02), 824 So.2d 1089, cert. denied, 537 U.S. 864, 123 S.Ct.260, 154 L.Ed.2d 107 (2002). The lengths to which the state must go to try to produce a witness is a question 124of reasonableness. State v. Fuller, 32,734 (La.App.2d Cir.12/17/99), 759 So.2d 104, writ denied, 2000-0159 (La.8/31/00), 766 So.2d 1273. Finally, the erroneous admission of other crimes evidence has long been held subject to harmless error review. LSA-C.Cr.P. art. 921; State v. Garcia, 2009-1578 (La.11/16/12), 108 So.3d 1.
In the instant case, the trial court accepted the testimony of A.T. and Jones, an investigator for the district attorney’s office, to determine the availability of S.C. Thereafter, the court made a factual determination that she was unavailable to testify. Jones testified that he attempted to serve S.C. with a subpoena at her mother’s house, but her mother would not provide an address for S.C. Jones then spoke to other family members, who informed him that S.C. lived in Arkansas. He located an address where she had lived, but he was told that she moved away. Thereafter, someone told Jones that S.C. had moved to Texas. However, no one was able to provide him with an address for her. Accordingly, we agree with the trial court that the state’s efforts to locate S.C. were reasonable. Thus, we find no manifest error in the trial court’s determination that she was unavailable.[20]
This assignment lacks merit.

Sentences

The defendant also contends his sentences are excessive. He concedes that, with the exception of the sentence imposed for attempted aggravated incest, the sentences are the minimum sentences allowable for | ¾#!! of his crimes of conviction. Nonetheless, the defendant argues that the consecutive nature of some of the sentences results in a 50-year sentence — a life sentence for a person of his age. The defendant also notes the letters submitted on his behalf from family and friends, his lack of a criminal history, and the fact that his imprisonment would be a hardship for his family, especially his elderly and ill ■wife. According to the defendant, he was entitled to a downward departure from the mandatory minimum sentences required for his convictions.
An appellate court utilizes a two-pronged test in reviewing a sentence for excessiveness. First, the record must show that the trial court took cognizance *165 of the criteria set forth in LSA-C.Cr.P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance, so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,-855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297.
The articulation of the factual basis for a sentence is the goal of LSA-C.Cr.P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual-basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with LSA-C.Cr.P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.8/13/08), 989 So.2d 267. The important elements which should be considered are the defendant’s personal history (age, family ties, marital status, health, | ^employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.8/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.9/28/07), 964 So.2d 351.
Second, the court must determine whether the sentence is constitutionally excessive. A sentence violates La. Const. Art. I, § 20, if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.1/24/07), 948 So.2d 379.
 The trial court is given wide discretion in the imposition of 'sentences within the statutory limits. Such a sentence will not be set aside as excessive absent a manifest abuse of that discretion. State v. Williams, 2003-3514 (La.12/13/04), 893 So.2d 7; State v. Thompson, 2002-0333 (La.4/9/03), 842 So.2d 330; State v. Diaz, 46,750 (La.App.2d Cir.12/14/11), 81 So.3d 228. On review, an appellate court does not determine whether another sentence may have been' more appropriate, but whether the trial |27Court abused its discretion. State v. Williams, supra; State v. Free, 46,894 (La.App.2d Cir.1/25/12), 86 So.3d 29. Where the convictions stem from separate incidents involving different victims and occur over a lengthy period of time, the resulting consecutive penalties will generally not be found to be an abuse of that discretion. State v. Porter, 29,638 (La.App.2d Cir.9/24/97), 700 So.2d 1058, 1062, writ denied, 97-2674 (La.2/13/98), 706 So.2d 993.

Aggravated Incest/Attempted Aggravated Incest

In 2003, when the defendant committed the offenses against C.W., aggravated incest was punishable by imprisonment at hard labor for not less than 25 years, nor more than 99 years, with at least 25 years to be served without benefit of parole, probation or suspension of sentence. LSA-R.S. 14:78.1.[21] Attempted *166 aggravated incest was punishable by imprisonment for up to 49 1/2 years at hard labor without the benefit of parole, probation or suspension of sentence. LSA-R.S. 14:78.1; LSA-R.S. 14:27.[22]
| ^During the defendant’s sentencing hearing, the trial judge noted his review of several letters submitted both on behalf of the defendant and the victims, the defendant’s pre-sentence investigation report (PSI) and the relevant sentencing factors set forth in LSA-C.Cr.P. art. 894.1. The trial court specifically noted that the defendant was elderly and did not have a criminal record. Nevertheless, the court concluded that the defendant would likely commit another offense if not incarcerated. Additionally, the court concluded that the defendant was in need of correctional treatment and a lesser sentence would deprecate the seriousness of his crimes. The trial court emphasized the effect of the defendant’s actions on his victims, who were all very young and vulnerable at the time the offenses occurred. The court also noted that the defendant used his position or status to facilitate the commission of the crimes and also utilized intimidation or threats of violence to carry out his offenses.
We find that the trial court did not abuse its great discretion in imposing the consecutive sentences of 25 years for the aggravated incest conviction and 20 years for the attempted aggravated incest conviction. The record reveals that the court considered the relevant mitigating factors, including the defendant’s advanced age, his lack of a criminal history and the hardship that his incarceration would cause his family. Moreover, neither sentence is near the maximum range for the corresponding crime. In fact, the defendant received the minimum sentence allowable for his |2flaggravated incest conviction, for which he could have received a sentence of 99 years. Additionally, the defendant was exposed to a sentence of 49 1/2 years for his attempted aggravated incest conviction. Given the grievousness of defendant’s actions, we find that the sentences imposed for the defendant’s aggravated incest and attempted aggravated incest convictions are not constitutionally excessive.
(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.

Sexual Battery/Molestation of a Juvenile

Prior to August 15, 2006, LSA-R.S. 14:48.1, the statute defining the punishment for sexual battery, did not provide for an enhanced sentence in cases in which the victim is under the age of 13. See Acts 2006, No. 103, § 1. In other words, prior to the 2006 amendment, LSA-R.S. 14:43.1 provided that the crime of sexual battery was punishable by imprisonment for not more than 10 years without the benefit of parole, probation or suspension of sentence. As stated above, the defendant committed the crime of sexual battery in 2003 (as to S.T.), and between 1997 and 2000 (as to D.H.),
Similarly, prior to August 15, 2006, LSA-R.S. 14:81.2, the statute establishing *167 the offense of molestation of a juvenile, did not provide for an enhanced sentence where the victim is under the age of 13. See Acts 2006, No. 103, § 1. During the period of time -within which the defendant committed the crime of molestation of a juvenile against D.H. (between January 1, 1997 and April 1, 2000), the maximum sentence for that offense was 15 years, with or without hard labor.[23]
LoA defendant must be sentenced according to sentencing provisions in effect at the time of the commission of the offense. State v. LeBlanc, 2014-0163 (La.1/9/15), 156 So.3d 1168; State v. Sugasti, 2001-3407 (La.6/21/02), 820 So.2d 518. The imposition of a harsher sentence than that prescribed at the time the offense was committed constitutes a violation of the ex post facto clauses of both the federal and state constitutions. State v. Taylor, 34,823 (La.App.2d Cir. 7/11/01), 793 So.2d 367; State v. Moore, 37,046 (La.App.2d Cir. 5/14/03), 847 So.2d 97.
In light of the sentences in effect at the time the defendant committed sexual battery and molestation of a juvenile, we find that the sentences are illegally harsh. Accordingly, we hereby vacate the sentences imposed for the sexual battery and molestation of a juvenile convictions and remand this matter to the trial court for resentenc-ing.
ERRORS PATENT
We have reviewed this record for errors patent. Our review reveals that the trial court failed to inform the defendant of the sex offender notification requirements outlined in LSA-R.S. 15:542-543.[24] Aggravated incest, attempted aggravated incest, sexual battery and molestation of a [S1 juvenile are sex offenses under LSA-R.S. 15:541.[25] The trial court did not provide the defendant with written notification of the sex offender requirements. Accordingly, the trial court is hereby ordered to provide the appropriate written notice to defendant of the sex offender registration requirements during resentencing.
CONCLUSION
For the reasons set forth herein, we affirm the defendant’s convictions. We also affirm the sentences imposed for aggravated incest and attempted aggravated incest. We vacate the sentences imposed for sexual battery and molestation of a juvenile and remand this matter to the trial court for resentencing. Additionally, during resentencing, the trial court shall provide the appropriate written notice to the defendant of the sex offender registration requirements.
CONVICTIONS AFFIRMED; SENTENCES FOR AGGRAVATED INCEST *168 AND ATTEMPTED AGGRAVATED INCEST AFFIRMED; SENTENCES FOR SEXUAL BATTERY VACATED; SENTENCE FOR MOLESTATION OF A JUVENILE VACATED. REMANDED WITH INSTRUCTIONS.

. The original bill of information was filed on May 13, 2011, but was amended on January 8, 2014, to correct the date of birth of one of the victims. The defendant was also initially charged (originally numbered as Count Six) with indecent behavior with a juvenile between the dates of January 1, 1997 and April 1, 2000, upon D.H. However, the bill of information was amended to reflect the dismissal of that charge after the trial court granted the defendant's motion to quash.

. The defendant was found not guilty of one count of sexual battery.

. The victims in this matter will be referred to by their initials for confidentiality purposes in accordance with LSA-R.S. 46:1844(W). Additionally, when possible, the relatives, whose identity could aid in the identification of the victims, will be referred to either by their initials or by their relation to the victims.

. C.W.’s date of birth is May 12, 2003. At the time of the offenses, C.W. was seven years old and the defendant, whose date of birth is July 4, 1941, was approximately sixty-nine years old.

. After learning of C.W.’s allegations, Deputy Matich contacted Sergeant Jo Caston, of the Ouachita Parish Sheriff’s Office and informed her about the alleged incidents. Sgt. Caston instructed Deputy Matich to arrange forensic interviews for R.W., C.W. and H.W. in Michigan. The interviews were conducted by Jennifer Dubs and were observed by Deputy Matich and a representative from child protective services. Thereafter, Deputy Ma-tich forwarded to Sgt. Caston a video recording of the interviews.

. Subsequently, H.W. confided to her mother that the defendant had attempted to touch her breasts. The defendant was not charged with any sexual misconduct pertaining to either R.W. or H.W. Therefore, those allegations will not be addressed in this opinion.

. C.W. pointed to the area she referred to as ‘'privates” (her vagina) and "yucky part” (the defendant's penis) on anatomical drawings. The drawings were admitted into evidence as State's Exhibit Nos. 7-9.

. C.W. testified in a separate room, with her testimony being provided via immediate video feed.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The defendant signed a written waiver of his Miranda rights which was admitted into evidence as State’s Exhibit No. 11.

. Prior to Sgt. Caston's testimony, a hearing was held, after which the trial court determined that the defendant’s statement (with the court’s redaction) was admissible.

. A short is essentially a pair'of shorts with a panel of fabric, resembling a skirt, covering the front.

. D.H. later testified as a rebuttal witness and stated that she did not learn that the man in the Santa Claus costume was the defendant until after she testified on direct examination.

. A.T. testified that S.T.’s date of birth is October 9, 1992, and S.C. is a few months younger than S.T. She stated that S.C. was born in 1993. A.T. also testified that the girls would be accompanied by her son and her nephew.

.A.T. testified that her youngest son told her that S.T. had confided to him that the defendant had touched her. However, the state and trial court seemed to be under the impression that A.T.’s nephew, Ryan, first relayed S.T.'s initial complaint.

. The photograph was admitted into evidence as Defense Exhibit No. 3.

. LSA-R.S. 14:78.1 was repealed by Acts 2014, No. 177, § 2; Acts 2014, No. 602, § 7, eff. June 12, 2014, and the proscribed actions previously covered by that statute are now included in LSA-R.S. 14:89 (aggravated crime against nature).

. The evidence adduced at trial indicates that C.W. made an initial complaint of the defendant’s sexually assaultive behavior to her mother. As such, C.W.’s statement to her mother was not hearsay under LSA-C.E. art. 801(D)(1)(d) and was admissible for the truth of the matter asserted (that the defendant touched her vagina). See State ex rel. M.Q., 98-1017 (La.1/29/99), 728 So.2d 849.

. LSA-R.S. 14:43.1 has since been amended by Acts 2003, No. 232, § 1; Acts 2006, No. 103, § 1; Acts 2008, No. 33, § 1; Acts 2011, No. 67, § 1. The amendments expanded the definition of sexual battery and increased the penalty for commission of a sexual battery upon a child under the age of 13.

. The bill of information specifically charged that the defendant used his position of control or supervision over D.H. to commit the offense of molestation of a juvenile.

. Further, any alleged error is harmless because S.T. testified at trial that she saw the defendant touching S.C. under her bathing suit.

. LSA-R.S. 14:78.1 provided, in pertinent part:
[[Image here]]
Whoever commits the crime of aggravated *166 incest on a victim under the age of thirteen years when the offender is seventeen years of age or older shall be punished by imprisonment at hard labor for not less than twenty-five years nor more than ninety-nine years. At least twenly-five years of the sentence imposed shall be served without benefit of parole, probation or suspension of sentence.

. LSA-R.S. 14:27 provides:
D. Whoever attempts to commit any crime shall be punished as follows:
[[Image here]]

. LSA-R.S. 14:81.2(D)(1) provided:
Whoever commits the crime of molestation of a juvenile when the offender has control or supervision over the juvenile shall be fined not more than ten thousand dollars, or imprisoned, with or without hard labor, for not less than one nor more than fifteen years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with Code of Criminal Procedure Article 893.

. LSA-R.S. 15:542 provides registration requirements for sex offenders. LSA-R.S. 15:543 requires that the trial court notify a defendant charged with a sex offense in writing of the registration requirements.

.All of the defendant’s crimes of conviction have been defined as a "sex offense” for purposes of LSA-R.S. 15:540 et seq., since 1997. Additionally, it is well settled that Louisiana's sex offender registration requirements are not punitive, but rather, they are remedial and may be applied retroactively without violating the prohibition of the ex post facto clause. Smith v. State, 2010-1140 (La.1/24/12), 84 So.3d 487.