Judgment rendered June 29, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,580-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

GENTRY ELVRIDGE VINSON                      Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 367,533

Honorable John D. Mosely, Jr., Judge

* * * * *

LOUISIANA APPELLATE PROJECT              Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                    Counsel for Appellee
District Attorney

REBECCA A. EDWARDS
SENAE D. HALL
MEKISHA S. CREAL
Assistant District Attorneys

* * * * *

Before PITMAN, COX, and HUNTER, JJ.

**HUNTER, J.**

Defendant, Gentry Elvridge Vinson, was charged by bill of indictment with the aggravated rape of R.C.,[1] in violation of La. R.S. 14:78.1(A), the aggravated rape of S.W., in violation of La. R.S. 14:78.1(A), aggravated incest, in violation of La. R.S. 14:78.1(A), molestation of a juvenile, in violation of La. R.S. 14:81.2(A) and (D)(1), and molestation of a juvenile, in violation of La. R.S. 14:81.2(A) and (C). Following a trial, a unanimous jury found defendant guilty as charged.

Defendant was sentenced as follows: life in prison at hard labor without the benefit of parole, probation, or suspension of sentence for each of the aggravated rape convictions; 20 years at hard labor for the aggravated incest conviction; 15 years at hard labor without the benefit of probation, parole, or suspension of sentence for one count of molestation of a juvenile; and 15 years at hard labor for the other count of molestation of a juvenile. The sentences were ordered to be served concurrently. For the following reasons, we affirm the convictions and sentences. We remand this matter to the trial court with instructions to provide defendant with written notice of the sex offender registration requirements.

## FACTS

The evidence adduced at trial reveals defendant was accused of raping and molesting his stepdaughter, R.C., from 1997 through 2003. He was also accused of raping his niece, S.W., "on or about1999."

---

[1]Pursuant to La. R.S. 46:1844(W), in order to protect the identities of the victims, we will use initials in place of the names of all minors, victims of sexual abuse, and their family members.

Further, the record reveals R.C. changed her name from Q.Y. in 2018. Portions of the record refer to this victim as Q.Y. For the purpose of clarity, she will be referred to as R.C. throughout this opinion.

R.C. was born in 1985. She was approximately three years old when defendant and her mother became involved in a romantic relationship and began cohabiting. Defendant and R.C.'s mother married in 1991. R.C. testified defendant was "like a father" to her, and he exercised control and supervision over her and her six younger siblings. She also testified her family lived in three residences during her childhood – an apartment in Shreveport, Louisiana, a house on Wagner Street in Shreveport, and a house in Keithville – and she described incidents of sexual abuse that occurred at each of the residences.

In March 2019, R.C. called the Shreveport Police Department ("SPD") and reported she had suffered many years of sexual abuse perpetrated by defendant. She stated the abuse began when she was "three or four" years old, and it did not end until she moved away from the family home at the age of 19. R.C. testified defendant began "fondling" her "almost immediately" after he and her mother began their relationship. She stated defendant was responsible for driving her to and from school, and he would "pull over" and "fondle" her in the car. R.C. recalled being in preschool when defendant began forcing her to "perform oral sex on him" in the car during the drive to and from school. R.C. also testified defendant began having vaginal, oral, and anal sexual intercourse with her when she was in the "third or fourth grade." She remembered defendant used "Blue Magic hair grease" as a lubricant when he would penetrate her anus with his penis.

R.C. further testified defendant would force her to wear her mother's clothing or lingerie, and he would always admonish her "she better not tell anybody." She stated the sexual abuse occurred at least five days a week,

primarily in the mornings after her mother left home to go to work. She asserted defendant would pull her into the bedroom he shared with her mother to engage in sexual intercourse. She also recalled occasions when her mother was at home and her family members were asleep, defendant would take her into the living room to engage in fondling or oral sex. R.C. testified on one occasion, when she was 12 or 13 years old, her mother walked into the room while defendant was having sexual intercourse with her. According to R.C., her mother "stormed out" of the room but did not say anything or intervene. She stated defendant "just made me put my clothes on, go into my bedroom and that was it."

Additionally, R.C. testified the sexual abuse was reported to authorities in 1997, when she was 12 or 13 years old. She recalled being interviewed by a social worker; however, she was unable to recall whether she was examined by a physician. As a result of the investigation, R.C. and her siblings were removed from the home and placed in three separate foster homes. R.C. testified she ultimately recanted the allegations because she believed she "needed to fix the problem and have all my siblings go back home." She explained she felt "sad [and] responsible" for her siblings being separated and placed into foster care. R.C. also testified when she was 13 or 14 years old, she held a family meeting "to tell what was going on in the home." She stated defendant's mother "made him apologize" for his actions. However, the sexual abuse continued.

Furthermore, R.C. testified her family moved to Keithville when she was 15 or 16 years old. She stated defendant impregnated her three times: in 2000 (when she was 14 or 15 years old), in 2002 (when she was 16 years old), and in 2003 (when she was 17 years old). With regard to her 2000

3

pregnancy, R.C. testified defendant revealed the pregnancy to her mother. She stated defendant told her mother he "had found [her] in a room having sex" with a boy, and he directed her mother to take her to have an abortion. She stated her mother complied and never asked her any questions about the pregnancy. R.C. also testified defendant took her to have abortions in 2002 and 2003. She stated she was a minor, and defendant signed all of the documents and paid for the procedures. R.C. attested no one at the abortion facility inquired as to the identity of the father, and she would not have told them in defendant's presence. R.C. admitted she did not inform the staff at Hope Medical Group for Women, the abortion facility, she was a victim of sexual abuse.[2]

R.C. testified she began working at Kroger during her junior year of high school, and defendant would pick her up from work, drive her to various parking lots or random locations, and have sexual intercourse with her. After she graduated from high school, she attended Louisiana Tech University for one year, and "they made me come home every weekend." She stated defendant would pick her up from campus every Friday, and the sexual abuse continued. She stated the abuse did not end until she moved away from the family home at the age of 19. R.C. testified she decided to report the abuse in 2019 because she "wanted justice" and she believed defendant "should pay for what he did."

---

[2] Stephanie Chaffee, an employee of Hope Medical Group for Women, testified the facility performs abortions and is a mandatory reporter of sexual abuse. Chaffee further asserted a minor undergoing an abortion must have the legal consent of a parent or legal guardian. During cross-examination, Chaffee admitted she was not employed at the facility in 2000, 2002, or 2003, and she had no knowledge of the regulations or procedures in effect at that time.

When she testified on cross-examination, R.C. recalled speaking to someone from the Department of Children and Family Services ("DCFS") in 1997. However, she reiterated she did not recall being examined by a physician, and she did not recall being told her physical examination did not reveal any evidence of sexual abuse. R.C. also testified she did not report the sexual abuse to anyone at her school, job, or university. R.C. admitted she returned home to visit her family "once or twice," after she moved out of the house. She also admitted her family moved to Baton Rouge, and she visited them during the 2018 Christmas holidays because she was in the area and "they were the only family [she] knew."

S.H., the wife of defendant and mother of R.C., testified during the trial. She stated she has seven children, and defendant is the biological father of the youngest five children. She testified she met defendant when R.C. was "about two" years old, and they moved in together soon thereafter. She and defendant married in 1991, and they divorced in August 2020, while defendant was awaiting trial on the current charges. S.H. testified during her marriage to defendant, she left home between 5:00 and 5:30 most mornings, she was "always at work," and her children were left in defendant's care when she was away from home. S.H. also testified defendant usually drove R.C. to and from school, and R.C. was frequently alone with him.

S.H. denied being aware of any allegations of sexual abuse in 1997. According to S.H., she was informed her children were being removed from the home and placed in foster care because defendant had physically disciplined her oldest son and left a bruise on his leg. She stated she did not recall being questioned by law enforcement regarding R.C.'s allegations of sexual abuse in 1997. S.H. recalled a family meeting being held, during

which defendant's grandmother and great-grandmother asked defendant to apologize "for whatever he did to [R.C.]" She stated she walked out of the meeting because she "did not feel comfortable in there."

Further, S.H. testified in 2000, defendant instructed her to take R.C. to have an abortion because "she did not need a baby" in high school. She claimed both R.C. and defendant told her R.C. was "pregnant by a guy at school that she had been messing around with." She stated she never attempted to ascertain the identity of "the guy," and she did not question or talk to R.C. about the pregnancy after the abortion was completed. S.H. testified she did not find it "odd" R.C. confided in defendant about her pregnancy because R.C. "talked to him about everything." S.H. recalled being aware of R.C.'s 2002 pregnancy, but she denied knowing about the 2003 pregnancy.

Additionally, S.H. denied walking into the room while defendant was "behaving inappropriately" with R.C. She recalled an occasion when she walked into the room and observed R.C. "massaging" defendant. She corroborated R.C.'s testimony regarding her (S.H.) habitually being away from home because she "worked all the time." She also confirmed R.C.'s testimony defendant was the one who usually transported R.C. to and from school and her job at Kroger, and he picked R.C. up from her college campus every Friday "90 percent of the time." S.H. also testified R.C. was in Baton Rouge during the Christmas holidays one year, and she "came by" to visit them. She further stated she was invited to a birthday party for R.C.'s son in 2017 or 2018, and R.C. told her defendant was not invited "because he raped her."

Deputy James B. Walker, Jr., of the Caddo Parish Sheriff's Office ("CPSO"), testified he was formerly employed by SPD, and he investigated R.C.'s 1997 sexual abuse allegations. He stated at that time, R.C. was 11 years old. He stated he interviewed R.C.'s mother, who informed him defendant had admitted to "two acts" involving R.C. Further, Deputy Walker testified R.C. described incidents which had occurred at the family's home on Wagner Street. R.C. reported defendant would "rub her on her butt" and touch her vaginal area inside her underwear while they were watching television. R.C. also conveyed defendant had placed "grease" on his penis, positioned her on her hands and knees, and "rubbed" his penis on her "private area" until "white liquid" erupted from his penis. Deputy Walker stated R.C. asserted defendant had asked her to forgive him and told her he would go to jail "if this came out."

Deputy Walker also testified he interviewed defendant on February 14, 1997. He stated after defendant was advised of his *Miranda* rights, defendant claimed the incident involving him touching R.C.'s "butt" was "innocent." Deputy Walker also stated defendant, without being prompted, denied exiting the bathroom with "grease" on his penis. Defendant explained he had "grease" on his hands due to a "facial condition." Deputy Walker also testified defendant admitted he "touched and rubbed" R.C.'s vaginal area underneath her clothing. However, defendant stated he used his hands, not his penis, to touch R.C. Deputy Walker also asserted defendant denied being aware of how R.C. had acquired knowledge about "white liquid," ejaculation, or semen. Further, Deputy Walker testified defendant had previously admitted to a DCFS investigator he rubbed his penis

7

"between R.C.'s legs"; however, defendant told the deputy he made that statement because he was "confused by the questions."[3]

S.W. was born in 1987. She testified defendant was her paternal uncle, and she would sleep at his house some nights when she was between the ages of seven and 10. S.W. stated during one overnight visit, she was on the living room sofa, asleep "on her stomach" when she was awakened by defendant on "top of her." She testified defendant ran to the bathroom, returned with "something wet" on his penis, and he penetrated her anus with his penis. She asserted defendant told her he would "get off" of her if she would "suck his thing." She stated she "shook [her] head and said no." S.W. also asserted three other children were asleep on the living room floor at the time of the incident, and R.C. witnessed the incident.[4]

S.W. also testified she told her family about the incident, and her father (defendant's brother) "slapped [her] so hard he left a handprint on [her] face." She stated her mother reported the incident to law enforcement, but she (S.W.) did not recall being interviewed. She also stated she spoke to a detective in 2019, and she showed him the house on Wagner Street in Shreveport, where the rape had occurred.

S.H. testified S.W. would sometimes visit and spend the night at her home. She stated a police officer came to her job and questioned her about

---

[3] The record reveals on February 14, 1997, defendant was charged with indecent behavior with juveniles. However, as stated above, R.C. recanted the allegations, and the charge was dismissed. During his testimony at the current trial, Deputy Walker testified he was unable to locate the recordings of the interviews he conducted during the 1997 investigation, and he relied on his past reports for his trial testimony. He testified his report noted R.C. had been examined by a physician, and there was no evidence of penetration.

[4] R.C. denied witnessing the rape of S.W.

S.W.'s allegation of rape. However, she denied any personal knowledge about defendant sexually abusing R.C. or S.W.

Lieutenant Rita R. Caldwell, of the SPD, testified she and a DCFS investigator interviewed S.W. at school on December 10, 1999. At that time, S.W. was 12 years old, and the incident involving defendant had occurred two years prior to the interview. According to Lt. Caldwell, S.W. identified defendant as her uncle and stated he was the person who had sexually abused her at his home on Wagner Street in Shreveport. S.W. reported defendant "got on top of her" while she was sleeping on the sofa, and he placed his hand and "private area" in her "private area." S.W. also stated defendant left the room, and when he returned, he told her he would stop if she would suck his penis.

Lt. Caldwell testified she attempted to interview members of S.W.'s family, but they refused to cooperate in the investigation. She interviewed R.C., who claimed S.W. was lying. However, according to Lt. Caldwell, R.C. corroborated certain aspects of S.W.'s account of the incident without being prompted. Lt. Caldwell stated she knew R.C. was not being truthful during the interview because she would "say some of the things that [S.W.] actually told us without me and the investigator saying it[.]" She further testified she questioned R.C. about the 1997 allegations, and R.C. stated she had lied about the abuse. R.C. explained to the officer she and her siblings had been removed from the home by DCFS, and they were able to return home after she told authorities the allegations were untrue. Lt. Caldwell stated she ended the interview after R.C. became "uncooperative and upset." She testified the investigation into S.W.'s allegations ended in 2002 when the district attorney's office declined to prosecute defendant.

Detective Jerry Monereau, of the SPD, testified he investigated R.C.'s complaint in 2019. He stated R.C. informed him defendant's conduct progressed "from touching to inserting his penis in her vagina and oral sex and things of that nature." Det. Monereau further stated R.C. reported defendant was responsible for driving her to and from school, and he would "pull over and sexually assault her." He testified he also interviewed S.W., who provided an account of the incident involving defendant inserting his penis into her anus when she was 10 years old. Det. Monereau stated he obtained a warrant for defendant's arrest after interviewing R.C. and S.W. and reviewing reports from the prior complaints.

Detective Chris Ardoin, of the CPSO, testified he assisted in the investigation of R.C.'s 2019 complaint. He testified as to R.C.'s account of the incidents of oral, anal, and vaginal sexual intercourse, and the acts of incest and molestation, which spanned over approximately 16 years. Det. Ardoin also stated he reviewed the previous reports pertaining to R.C. and S.W. and noted defendant had been arrested for the abuse of R.C. Det. Ardoin stated the 1997 case was dismissed because R.C. recanted her story so she and her sibling would be allowed to return to the family home. He also testified R.C. inquired as to whether she could file criminal charges against her mother because her mother knew about the sexual abuse but did not do anything about it. Det. Ardoin stated he did not interview R.C.'s mother, and he did not participate in the investigation of S.W.'s allegations.

Alex Person testified she is the Director of Education and a forensic interviewer at the Gingerbread House Children's Advocacy Center. She was accepted by the trial court as an expert in child sexual abuse and delayed disclosure. She testified she did not interview defendant or the victims in

10

this case, and she did not review any of the police reports. Person also testified delayed disclosure or reporting is common in sexual abuse cases. She stated delayed disclosures involving child victims are associated with the following: limited family support; the victim feeling he or she will not be believed; potential negative consequences of the disclosure; and feelings of shame, guilt, and self-blame. Person also stated children who disclose sexual abuse often recant the allegations because they feel responsible for the outcome once the disclosure has been made. She explained that having a family separated, with the children being placed in foster care, would be a reason for a child to recant allegations in an effort to "fix" the situation. Further, she stated it is not unusual for a victim to maintain contact with the abusive family member. According to Person, immediate disclosures of sexual abuse are generally more detailed than delayed disclosures, and there is often no physical evidence of sexual abuse, especially in cases of delayed disclosures. Additionally, Person testified children can make allegations, recant, and re-urge the allegations at a later time because "adults can reason . . . their brain is much more developed than a child so they can go through all these reasons and barriers . . . and bring that back up."

During cross-examination, Person testified a lack of physical evidence of sexual abuse in cases of delayed disclosure is not uncommon because "private areas heal very quickly." She also testified just because a victim recants abuse allegations does not mean the abuse did not occur.

No defense witnesses were called to testify at trial.

A unanimous jury found defendant guilty as charged of the aggravated rape of R.C., the aggravated rape of S.W., aggravated incest involving R.C., and two counts of molestation of a juvenile involving R.C. Defendant was

sentenced as follows: life in prison at hard labor without the benefit of parole, probation, or suspension of sentence for each of the aggravated rape convictions; 20 years at hard labor for the aggravated incest conviction; 15 years at hard labor without the benefit of parole, probation, or suspension of sentence for one of the molestation of a juvenile convictions; and 15 years at hard labor for the other molestation of a juvenile conviction. The sentences were ordered to be served concurrently. The trial court denied defendant's motion for new trial, motion for post-verdict judgment of acquittal, and motion to reconsider sentences.

Defendant now appeals.

### DISCUSSION

Defendant contends the evidence was insufficient to support his convictions due to inconsistencies in the testimony of the victims. According to defendant, R.C. was unable to recall some of the statements she made during the course of the investigation, and her memory of the alleged acts of rape and molestation was "vague, lacking specifics necessary to challenge her on cross examination." Defendant also asserts R.C. contradicted S.W.'s testimony that R.C. witnessed her rape. Consequently, he argues the state failed to meet its burden of proving, beyond a reasonable doubt, he committed the offenses.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the case in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Hearold*, 603 So. 2d 731 (La. 1992). *See also* La. C. Cr. P. art. 821. This standard does not

12

provide an appellate court with a vehicle for substituting its appreciation of the evidence for that of the fact finder. *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. *State v. Casey*, 99-0023 (La. 1/26/00), 775 So. 2d 1022, *cert. denied*, 531 U.S. 840, 121 S. Ct. 104, 148 L. Ed. 2d 62 (2000). The appellate court does not assess credibility or reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court affords great deference to a trial court's decision to accept or reject the testimony of a witness in whole or in part. *State v. Gilliam*, 36,118 (La. App. 2 Cir. 8/30/02), 827 So. 2d 508, *writ denied*, 02-3090 (La. 11/14/03), 858 So. 2d 422.

In the absence of internal contradiction or irreconcilable conflict with the physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a factual conclusion. *State v. Johnson*, 54,028 (La. App. 2 Cir. 9/22/21), 328 So. 3d 524, *writ denied*, 21-01850 (La. 2/22/22), 333 So. 3d 441; *State v. Elkins*, 48,972 (La. App. 2 Cir. 4/9/14), 138 So. 3d 769, *writ denied*, 14-0992 (La. 12/8/14), 153 So. 3d 438. This is equally applicable to the testimony of victims of sexual assault. *Id.* Such testimony alone is sufficient even when the state does not introduce medical, scientific or physical evidence to prove the commission of the offense. *Id.*

*Aggravated Rape*

Prior to 2006, La. R.S. 14:42 provided, in pertinent part:

A. Aggravated rape is a rape committed *** where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
***

13

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

*** 

In the instant case, R.C. testified defendant began forcing her to perform oral sex on him when she was approximately three or four years old, and he began engaging in vaginal and anal sexual intercourse with her when she was in the third or fourth grade. She testified the acts of sexual abuse occurred at least five times a week and did not end until she was 19 years old. Law enforcement officials also testified R.C. disclosed defendant had begun forcing her to perform oral sex when she was approximately four years old, and the vaginal and anal penetration began when she was approximately nine years old.

S.W. testified when she was between seven and ten years old, she would sometimes spend the night at defendant's house. She stated she was asleep on the living room sofa when defendant penetrated her anus with his penis. S.W. stated defendant told her he would "get off if I suck his thing." Lt. Caldwell testified she and a DCFS investigator interviewed S.W. approximately two years after the incident, and S.W., who was 12 years old at that time, relayed to them the details involving the rape.

After viewing the evidence in the light most favorable to the prosecution, we conclude the evidence was sufficient to prove, beyond a reasonable doubt, defendant was guilty of the aggravated rape of R.C. and S.W. Pursuant to the statutory definition of aggravated rape, at the time the crimes were committed, the evidence established defendant engaged in anal, oral, or vaginal sexual intercourse with victims under the age of 13 years. It is clear from the verdict the jury found the testimony of R.C. and S.W. credible, and their testimony alone was sufficient to support defendant's

14

conviction of aggravated rape. The jury's decision to accept the victims' testimony as truthful is entitled to great deference. Accordingly, we find the foregoing testimony was sufficient to support the jury's verdict.

*Aggravated Incest*

Prior to 2006, La. R.S. 14:78.1 defined the crime of aggravated incest as follows:

> A. Aggravated incest is the engaging in any prohibited act enumerated in Subsection B with a person who is under the age of eighteen years of age and who is known to the offender to be related to the offender as any of the following biological, step, or adoptive relatives: child, grandchild, of any degree, brother, sister, half-brother, half-sister, uncle, aunt, nephew, or niece.
>
> B. The following are prohibited acts under this Section:
> (1) Sexual intercourse, sexual battery, second degree battery, carnal knowledge of a juvenile, indecent behavior with juveniles, pornography involving juveniles, molestation of a juvenile, crime against nature, cruelty to juveniles, parent enticing a child into prostitution, or any other involvement of a child in sexual activity constituting a crime under the laws of this state.
> (2) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both.

In the instant case, the evidence established the defendant was the husband of R.C.'s mother, and R.C. was defendant's stepdaughter. Further, the majority of the acts committed against R.C. occurred when she was under the age of 18, and she was "known to the offender to be related" to him as his stepdaughter. The evidence also established the acts committed by defendant, *i.e.*, sexual intercourse, molestation, "lewd fondling or touching," were done or submitted to with "the intent to arouse or to satisfy the sexual desires of either the child, the offender, or both." Accordingly, viewing the evidence in a light most favorable to the prosecution, we find

the evidence was sufficient to prove defendant was guilty of aggravated incest.

*Molestation of a Juvenile*

Prior to 2006, when the alleged acts of molestation were committed, La. R.S. 14:81.2 provided, in pertinent part:

> A. Molestation of a juvenile is the commission by anyone over the age of seventeen of any lewd or lascivious act upon the person or in the presence of any child under the age of seventeen, where there is an age difference of greater than two years between the two persons, with the intention of arousing or gratifying the sexual desires of either person, by the use of force, violence, duress, menace, psychological intimidation, threat of great bodily harm, or by the use of influence by virtue of a position of control or supervision over the juvenile. Lack of knowledge of the juvenile's age shall not be a defense.
>
> ***
>
> Although the statute does not define the terms "lewd" or "lascivious,"

the Louisiana Supreme Court has determined the statute "provides fair notice that the defendant is charged with having done an act upon the person of a juvenile which is lustful, obscene, indecent, tending to deprave the morals in respect to sexual relations, and relating to sexual impurity or incontinence carried on in a wanton manner." *State v. Interiano*, 03-1760 (La. 2/13/04), 868 So. 2d 9, 15. Evidence is sufficient to prove "the use of influence by virtue of a position of control or supervision" as an element of molestation of a juvenile where a defendant frequently had the victim in his charge without other adults present. *State v. Sanderson*, 49,957 (La. App. 2 Cir. 7/22/15), 174 So. 3d 149; *State v. Goss*, 46,193 (La. App. 2 Cir. 5/18/11), 70 So. 3d 6.

Herein, the evidence established from 2000-2003, defendant was over the age of 17, R.C. was under the age of 17, and there was an age difference of greater than two years between them. The evidence further showed R.C.

16

was frequently left in defendant's charge, without other adults present, while her mother worked. Additionally, the evidence revealed defendant committed lewd and lascivious acts upon R.C., *i.e.*, fondling, vaginal, oral, and anal sexual intercourse, with the intention of arousing or gratifying his sexual desires "by the use of influence by virtue of a position of control or supervision over the juvenile," and "the incidents of molestation recur[red] during a period of more than one year." Consequently, we find the elements required to prove molestation of a juvenile under La. R.S. 14:81.2 were satisfied.

## ERRORS PATENT

In conducting our review for errors patent in accordance with La. C. Cr. P. art. 920, we note the trial court failed to inform defendant of the sex offender notification and registration requirements, as mandated by La. R.S. 15:543. Defendant's convictions for aggravated rape, aggravated incest, and molestation of a juvenile, "sex offenses" as defined by La. R.S. 15:541, require defendant be subjected to the sex offender notification and registration requirements. La. R.S. 15:542. Pursuant to R.S. 15:543, the trial court is required, using the form contained in La. R.S. 15:543.1, to notify a defendant convicted of a sex offense in writing of the registration and notification requirements. The statute further requires that an entry be made in the court minutes stating the written notification was provided.

Here, a review of the record and minutes reveals the trial court did not inform, either orally or in writing, defendant of the sex offender notification and registration requirements. As a result, remand is required with instructions to the trial court to provide the appropriate written notice to defendant of the sex offender registration requirements and to make an entry

17

in the court minutes stating such notice was provided.  La. R.S. 15:543; *State v. Griffin*, 51,506 (La. App. 2 Cir. 9/1/17), 243 So. 3d 1205, *writ denied*, 17-0141 (La. 5/18/18), 242 So. 3d 1226; *State v. Moody*, 50,955 (La. App. 2 Cir. 11/16/16), 209 So. 3d 264, *writ denied*, 17-0298 (La. 11/13/17).

## CONCLUSION

For the reasons set forth herein, defendant's convictions and sentences are hereby affirmed.  This matter is remanded to the trial court with instructions to correct the minutes and to provide defendant with written notice of the requirement that he register as a sex offender.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**